KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700
Blythe E. Lovinger (BL-9577)
Daniel Turinsky (DT-3956)
Allison S. Weiss (AW-4560)


*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

CHRISTINA SPARROCK                              :

                    Plaintiff,          :

        - against -                  :

                           :

NYP HOLDINGS, INC. dba NEW YORK
POST,                                           :

               Defendant.          :
-------------------------------------------------------------x

06 CV 1776 (SHS)(GWG)

(Oral argument requested)


**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS ....................................................................................2

    A.    The Commencement of Sparrock's Employment and Pay Raise in 2003..............2

    B.    Sparrock's March 30, 2004 Letter Alleging Disparate Treatment .......................3

    C.    Sparrock's April 29, 2004 E-mail..........................................................5

    D.    Sparrock's May 19, 2004 Letter Alleging Retaliation ..........................................5

    E.    The Post's Investigation of All of Sparrock's Allegations.....................................6

    F.    Sparrock's Medical Leaves, SOX Assignment and Resignation ..........................9

    G.    Sparrock's Next Employment as a SOX Auditor..................................................11

    H.    Sparrock's EEOC Charge and Federal Complaint Filed 113 Days Later ............11

ARGUMENT....................................................................................................12

    I.    THE SUMMARY JUDGMENT STANDARD ..................................................12

    II.    THE POST CANNOT BE LIABLE FOR THE ALLEGED SEXUAL HARASSMENT OF PLAINTIFF ........................................................................12

        A.    The Post Had In Place An Effective Policy To Prevent And Remedy Unlawful Harassment....................................................14

        B.    Sparrock Unreasonably Failed To Notify the Post About Her Allegations Of Harassment.................................................14

    III.    THE POST IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM OF RETALIATION........................................................16

        A.    Plaintiff Cannot Establish A Prima Facie Case Of Retaliation Because No Adverse Action Was Taken Against Her ...........................16

        B.    The Post Had Legitimate, Nonretaliatory Reasons For Assigning Plaintiff To the SOX Position, Which She Cannot Disprove...................19

    IV.    PLAINTIFF'S EQUAL PAY ACT CLAIM SHOULD BE DISMISSED ..........20

i

V.     AS A MATTER OF LAW, PLAINTIFF CANNOT ESTABLISH A
       CONSTRUCTIVE DISCHARGE CLAIM ...........................................................21

VI.    PLAINTIFF CANNOT ESTABLISH A DISPARATE TREATMENT
       CLAIM...........................................................................................................22

VII.   PLAINTIFF SHOULD BE SANCTIONED FOR SPOLIATION
       OF EVIDENCE ..............................................................................................24

CONCLUSION ....................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**          **Page**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)......................................................12

Baldwin v. Blue Cross/Blue Shield of Alabama, 480 F.3d 1287, 1303
(11th Cir. 2007) ...........................................................14

Baptiste v. Cushman & Wakefield, 2007 WL 747796 (S.D.N.Y. March 7, 2007)...........23

Breeding v. Cendant Corp., 2003 WL 1907971 (S.D.N.Y. April 17, 2003)...............14, 23

Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998) ........................................13, 15

Burlington Northern & Santa Fe Railway Co. v. White, 126 S. Ct. 2405 (2006).......17, 18

Butts v. New York City Department of Housing Preservation & Development,
2007 WL 259937 (S.D.N.Y. Jan. 29, 2007).................................................................19

Byrnie v. Town of Cromwell, 243 F.3d 93 (2d Cir. 2001).................................................24

Caridad v. Metropolitan-North Commuter R.R., 191 F.3d 283 (2d Cir. 1999), cert.
denied, 529 U.S. 1107 (2000)......................................................14

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ..................................................................12

Clark County School District v. Breeden, 532 U.S. 268 (2001) .......................................19

Eichler v. America International Group, Inc., 2007 WL 963279 (S.D.N.Y.
March 30, 2007) .....................................................................14, 16

Engelman v. National Broadcast Co., Inc., 1996 WL 76107 (S.D.N.Y.
Feb. 22, 1996)...........................................................................21

Faragher v. City of Boca Raton, 524 U.S. 775 (1998) ......................................................13

Felton v. New York Post, 1990 WL 113176 (S.D.N.Y. Aug. 2, 1990), aff'd,
930 F.2d 908 (2d Cir. 1991) ....................................................16

Ferraro v. Kellwood Co., 440 F.3d 96 (2d Cir. 2006) ...........................................13, 14, 22

Gilford v. City of New York, 2004 WL 1574695 (S.D.N.Y. July 14, 2004)....................19

Gamble v. Chertoff, 2006 WL 3794290 at *5 (S.D.N.Y. Dec. 27, 2006) ........................23

Grennan v. Nassau County, 2007 WL 952067 (E.D.N.Y. March 29, 2007)....................18

Gross v. National Broadcast Co., Inc., 232 F. Supp. 2d 58 (S.D.N.Y. 2002) ..................21

Katz v. Beth Israel Medical Center, 2001 WL 11064 (S.D.N.Y. Jan. 4, 2001) ...............22

Leopold v. Baccarat, Inc., 239 F.3d 243 (2d Cir. 2001)........................................13, 14, 15

Metropolitan Opera Association, Inc. v. Local 100, Hotel Employees and
Restaurant Employees International Union, 212 F.R.D. 178 (S.D.N.Y. 2003)...........24

Miller v. Time-Warner Communications, Inc., 1999 WL 440781 (S.D.N.Y.
June 29, 1999)...........................................................................24

Nieves v. Angelo, Gordon & Co., 2007 WL 1098710 (S.D.N.Y. April 10, 2007) ..........17

Nugent v. St. Luke's/Roosevelt Center, 2007 WL 1149979 at *15 (S.D.N.Y.
    April 18, 2007). ...................................................................................................23

O'Dell v. Trans World Entertainment Corp., 153 F. Supp. 2d 378
    (S.D.N.Y. 2001)..............................................................................................15, 17

Padob v. Entex Information Serv., 960 F. Supp. 806 (S.D.N.Y. 1997) ............................19

Penney v. AIG Domestic Claims, Inc., 2007 WL 541711 (S.D.N.Y. Feb. 20, 2007).......16

Pepsico, Inc. v. The Coca-Cola Co., 315 F.3d 101 (2d Cir. 2002)...................................12

Petrosini v. Bell Atlantic, 385 F.2d 210 (2d Cir. 2004) ...................................................22

Pollis v. New School for Social Research, 132 F.3d 115 (2d Cir. 1997) ....................21, 22

Residential Funding Corp. v. DeGeorge Finance Corp., 306 F.3d 99 (2d Cir. 2002).......24

Shumway v. United Parcel Service, 118 F.3d 60, 63 (2d Cir. 1997) ...............................23

Sherlock v. Montefiore Medical Center, 84 F.2d 522 (2d Cir. 1996) ..............................16

Spence v. Maryland Casualty Co., 995 F.2d 1147 (2d Cir. 1993) ...................................22

Tischman v. ITT/Sheraton Corp., 882 F. Supp. 1358 (S.D.N.Y. 1995)..........................12

Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) .......................................23

Woods v. Enlarged City School District of Newburgh, 473 F. Supp. 2d 498
    (S.D.N.Y. 2007)..............................................................................................16, 19

**Statutes**                                                                                                   **Page**

42 U.S.C. § 1981 ........................................................................................................1, 16

42 U.S.C.A. §2000e, et seq..............................................................................................1

29 U.S.C. § 206, et seq ...........................................................................1, 3, 4, 5, 6, 8, 21

Fed. R. Civ. P. 56............................................................................................................1, 12

N.Y. Admin. Code §8-107.................................................................................................1, 15

N.Y. Executive Law §296, et seq .....................................................................................1, 15

## PRELIMINARY STATEMENT

Defendant NYP Holdings, Inc. ("Defendant" or the "Post") submits this memorandum of law in support of its Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 and for sanctions based on spoliation of evidence.

Plaintiff Christina Sparrock ("Plaintiff" or "Sparrock"), a former employee of the Post who is African-American, asserts claims for discrimination, harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §2000e, et seq., the New York State and City Human Rights Laws, N.Y. Executive Law §296, et seq., and N.Y. Admin. Code §8-107, respectively, 42 U.S.C. § 1981 and the Equal Pay Act, 29 U.S.C. § 206, et seq. As set forth in more detail below, these claims should be dismissed as a matter of law.

First, the Post is entitled to summary judgment on Sparrock's claims of hostile environment sexual harassment based on the affirmative defense that Sparrock unreasonably failed to utilize the complaint procedure in the Post's policy prohibiting unlawful harassment where she admittedly did not report this alleged conduct to management or human resources.

Second, Sparrock cannot establish a claim of retaliation because the principal adverse action of which she complains is a voluntary transfer that occurred pursuant to her own request to a position that she was indisputably qualified to perform, seven months after she made a complaint to Human Resources that contained no allegations of sexual or racial harassment.

Third, Sparrock's claim of unequal pay is meritless because in setting the pay of the employee about whom Sparrock complains, the Post simply matched that employee's prior salary, defeating any inference of disparity based on gender.

Fourth, Sparrock was not constructively discharged, as she was not subjected to intolerable work conditions. Rather, while out on a leave of absence, she simply quit her job

two days after she received a new job offer with a substantial raise in pay, from a different company, and several months after the alleged incidents of sexual harassment came to an end.

Finally, Sparrock destroyed a tape-recording and has refused to turn over her hand-written notes of a critical meeting with the Post's in-house counsel which, the Post contends, would have assisted it in establishing its affirmative defense and contradicted Sparrock's allegations. The sanction for such destruction of evidence should be dismissal of her claims or, at the very least, preclusion of evidence.

## STATEMENT OF FACTS

### A.    The Commencement of Sparrock's Employment and Pay Raise in 2003

Sparrock began her employment at the Post in October 2002 as a Senior Financial Analyst in the Finance Department. Her supervisor was Post Controller David DelGaiso, and her salary was $59,000 per year. (Sp. Dep. 178-83, 237, 1122; Ex. 5).[1]

At that time, she received and signed a document acknowledging that she had received and read the Post's employee handbook (the "Handbook"), including its anti-harassment policy which states, among other things, that "employees who feel aggrieved because of harassment have an obligation to communicate their problems immediately," and that "[t]here will be no retaliation against a person who, in good faith, files a complaint or participates in any way in the investigation of a complaint. . . ." (Id. at 757-58, 765-66; Ex. 6, Ex. 7, pp. 12-13). Sparrock also testified that she was aware of these policies and complaint reporting procedures, and that the Human Resources Department was available to address such complaints. (Id. at 767-68, 308).

---

[1] References to the transcript of Plaintiff Christina Sparrock's January 9, 2007, February 12, 2007, February 22, 2007 and March 15, 2007 deposition (excerpts of which are attached to the accompanying Declaration of Daniel Turinsky as Exhibit 1) are designated as "(Sp. Dep. [page])." All exhibits referenced herein, unless otherwise specified, are attached to the Turinsky Declaration. References to the transcript of Linda Babajko's January 23, 2007 deposition (excerpts of which are attached as Exhibit 2) are designated as "(Babajko Dep. [page])." References to the transcript of Michael Racano's March 22, 2007 deposition (excerpts of which are attached as Exhibit 3) are designated as "(Racano Dep. [page])." References to the transcript of Frank Cusimano's February 9, 2007 deposition (excerpts of which are attached as Exhibit 4) are designated as "(Cusimano Dep. [page])."

On July 1, 2003, the start of the Post's fiscal year, Sparrock's salary was raised to $61,350 per year. (Id. at 245). That month, she received a job offer from another firm at a salary of $75,000 per year plus a ten percent bonus. (Id. at 246-50). She gave notice of her resignation, but when the Post matched the offer Sparrock elected to remain, despite the other firm's offer of an additional $5,000 which the Post did not match. (Id. at 250-52). Sparrock had written in her resignation e-mail on July 28, 2003 that her employment experience at the Post had been "very positive . . . both personally and professionally," and that her motive for leaving was financial (Ex. 8); she also testified that her resignation had nothing to do with any treatment she received at the Post. (Sp. Dep. 248). After accepting the Post's offer, which had been made by its General Manager Geoff Booth, Sparrock told him in a September 2, 2003 e-mail, "This is the best job I have ever had. I am learning new things every day and it is challenging and rewarding. Yup, I am staying and you're welcome." (Id. at 746-47; Ex. 9).

**B.    Sparrock's March 30, 2004 Letter Alleging Disparate Treatment**

Seven months later, by letter dated March 30, 2004 to Linda Babajko, the Post's Director of Human Resources, Sparrock stated that "I feel, as an African American female, that I do not currently work in an equal opportunity work environment." The letter alleged a number of ways in which she believed she was treated differently by DelGaiso than an unidentified white male employee, later identified as Greg Holzmann, who worked in the Post's Manhattan office in a different position. (Id. at 308, 238-40, 504-05; Ex. 10). Though Sparrock would, for the first time, later allege (in her First Amended Complaint) certain incidents she characterized as sexual or racial harassment at the Post's Bronx production facility where, since July 2003, she had been spending increasing amounts of her time (Id. at 510-11), the March 30, 2004 letter contained no allegations whatsoever of sexual or racial harassment. (Id. at 308, 238-40, 504-05; Ex. 10).

3

In meetings subsequent to the letter, Sparrock again made no allegation of sexual or racial harassment. Specifically, on March 31, 2004, the day after the letter was received, Babajko and J. Jordan Lippner, in-house counsel for the Post, met with Sparrock to investigate her complaint. Lippner met with her again on April 20, 2004 (after Sparrock cancelled two intervening meetings). (Babajko Dep. 30, 36-37; Sp. Dep. 309, 539-41). During these meetings Lippner prepared a memorandum containing the information Sparrock had provided him, and included a space for Sparrock to sign it, under a legend affirming she had read the statement and that it was "an accurate and complete account of everything that I am complaining to the company about with regard to my employment and how I am being treated." She initialed each page and signed it on April 30, 2004. (Declaration of J. Jordan Lippner dated May 11, 2007 ("Lippner Decl.") Ex. 2 (the "April 30th Memo"); Sp. Dep. 310, 545-46). Sparrock read the Memo and acknowledgment before signing it. (Sp. Dep. 310-11). As in her letter of March 30, 2004, Sparrock failed to describe any incidents of sexual or racial harassment, and the memorandum she endorsed explicitly stated she "ha[d] not been subjected to any negative or disparaging comments by Mr. DelGaiso or any other person at the Post that concern her being African American or a woman. Nor ha[d] she heard any such comments in general while working at the Post." (Lippner Decl. Ex. 2, p. 6).

Finally, at her deposition, Sparrock claimed that she later realized she told Lippner of two incidents that he omitted from the April 30th Memo. (Sp. Dep. 312-13, 559-62, 566-67, 570-71). Neither incident contained facts related to sexual or racial harassment. (Id.). She did not otherwise claim that the April 30th Memo was inaccurate or incomplete.

C.    **Sparrock's April 29, 2004 E-mail**

Sparrock was also apparently frustrated by what she regarded as a complicated budget and burdensome budget process. In testimony, Sparrock complained in particular about an April 20, 2004 meeting in the Bronx facility during a multi-day budget process which, after three hours, ended in a manner she characterized as abrupt and premature: "Joe just said while I was still updating my spreadsheets, Joe just said come on Ken, let's go, and Kris was by the door and they just walked out. No explanation, no nothing." (Id. at 61-62). Sparrock testified that this and other stress at work made her suicidal: "I just broke," she testified. (Id. at 56-63).[2]

In an e-mail dated April 29, 2004, she complained to management that "during the whole budget process, I had to hear, 'It is not my job, you are the Accountant, you do it,'" and similar statements. (Id. at 254-55; Ex. 11). In that e-mail, Sparrock requested that her position be full-time in Manhattan, because "no one [in the Bronx] respects my position, no one listens to me, and no one follows any of my instructions." (Ex. 11). The e-mail made no allegations of discrimination, harassment or retaliation, by name or implication. (Id.).

D.    **Sparrock's May 19, 2004 Letter Alleging Retaliation**

Several weeks after these events, in a May 19, 2004 letter to Lippner, Sparrock alleged that the Post had retaliated against her by: (1) the Post's failure to purchase a bag with wheels to allow her to more easily transport computer workbooks to the Bronx facility; and (2) Purchasing Manager Rick Reeves' questioning of her ability to maintain purchase orders. (Ex. 12; Sp. Dep. 319). That same day, Lippner met with Sparrock to discuss her concerns and prepared a

---

[2] Before joining the Post, Sparrock experienced several emotionally scarring events, including being hung out of a window by her mother (Sp. Dep. 711-12), being physically abused by her mother throughout childhood because, in Sparrock's words, "the culture of many African-American families is to get hit by their parents. . . .", (Id. at 976-77), overdosing on "Luden cough drops" as a teenager and having her stomach pumped (Id. at 968-69), having an abortion twenty years ago that supposedly caused her no emotional distress whatsoever (Id. at 1144-45; 1147-48), undergoing treatment by a therapist for anxiety while in college after accidentally ingesting an insect (Id. at 65), and undergoing treatment by "spiritual advisors" as a result of the stress and anxiety associated with the death of her closest friend during the September 11th terrorist attacks, which is her birthday. (Id. at 66-67, 1148-49).

memorandum, which again Sparrock initialed and signed, outlining everything she told him during the meeting (the "May 19th Memo"). (Lippner Decl. Ex. 7; Sp. Dep. 321-22). Notably, in the instant Complaint, Sparrock no longer asserts these events were retaliatory.[3]

Her May 19, 2004 letter, the May 19th Memo, as well as the written and verbal disclosures which had preceded them, made no mention of sexual or racial harassment. However, at the bottom of the May 19th Memo Plaintiff wrote, "there is additional information and evidence to substantiate my complaints that I have not yet provided." (Lippner Decl. Ex. 7; Sp. Dep. 324-25). Although Lippner explicitly asked Sparrock to provide that information to him or Ms. Babajko, she did not; in her deposition, she said she refused because she did not trust Lippner. (Sp. Dep. 323-25). However, she had no knowledge of any complaints previously investigated by Lippner, and no knowledge of Lippner or Human Resources ever failing to investigate complaints of discrimination or harassment. (Sp. Dep. 525-31). Finally, she expressly acknowledged in the May 19th Memo that she was not coerced into signing the April 30th Memo and did not believe it to be inaccurate. (Lippner Decl. Ex. 7).

## E.    The Post's Investigation of All of Sparrock's Allegations

After receiving each of the March 30th and May 19th letters, and after beseeching her to provide all information, Lippner promptly and thoroughly investigated Sparrock's complaints. (Lippner Decl. ¶¶7-51, 53-61). He interviewed her for several hours and met with DelGaiso, Holzmann and a number of persons identified by her as having supportive information. (Id. at ¶¶8-14, 18, 21-51, 53-55, 58-61). Lippner's investigation developed no information suggesting she was being subjected to either discrimination or retaliation. With respect to an assertion that DelGaiso raised his voice to her, at her deposition Sparrock admitted that he was a "loud talker"

---

[3] See First Amended Complaint, ¶¶43-48. In addition, at her deposition Sparrock admitted that she received the carrying bag with wheels, which the Post paid for, soon after May 19, 2004 (Sp. Dep. 638-41), that no one directed her to bring reference books to the Bronx facility (Id. at 647), and that she could have used the Microsoft computer system, which had an online help feature containing substantially the same information that was in her books. (Id.).

with everyone, including her male colleagues.   (Sp. Dep. 488).   She admitted that neither

DelGaiso, nor any other manager in Manhattan, ever made a sexually or racially based comment

to her.   (Id. at 206, 212, 782, 920).   Lippner also interviewed witnesses identified by Sparrock

who she claimed would support her allegation that DelGaiso yelled at her. (Lippner Decl. ¶25).

Each of these witnesses rebutted Plaintiff's claim, telling Lippner that they never heard DelGaiso

yell at Sparrock. (Lippner Decl. ¶29).

On or about June 23, 2004, Lippner advised Sparrock that his investigation did not reveal

any evidence to substantiate her allegations.   (Sp. Dep. 660).[4]   By letter dated July 25, 2004 to

Lippner, Sparrock wrote that she was unable to provide additional details of differential

treatment and retaliation "because my distress gets worse when I sit down to do so . . .."   (Ex. 13;

Sp. Dep. 330).   When asked why she continued to write to Lippner if she did not trust him,

Sparrock testified, "I just did."   (Sp. Dep. 330-31).   Lippner replied to Sparrock's July 25, 2004

letter by e-mail dated July 28, 2004, which she received, explaining, among other things, that

Sparrock should speak with Lippner or Babajko if there were other issues in the workplace that

she wanted addressed, and that he would be willing to reopen his investigation if she provided

him with additional information.   (Lippner Decl. Ex. 9; Sp. Dep. 926-29).

In her Amended Complaint, filed in 2006, Sparrock asserted for the first time that

between July 2003 and March 2004 she was subjected to sexual and racial harassment in the

Post's Bronx facility.   In her deposition, held in 2007, she alleged that certain managers in the

Bronx subjected her to inappropriate comments about her body, that: one asked to sleep with her;

once another rubbed up against her from behind while the two were dancing in the office; she

was invited to a strip club by Andy McCulloch, a good friend who was not a Post employee but

---

[4] Sparrock testified that during this meeting on June 23rd she told Lippner about overhearing a manager in the Bronx state that "Christina is working her ass off because she is afraid to lose her job...." (Sp. Dep. 657-58). Sparrock claims that even though Lippner explicitly told her that his investigation did not reveal any evidence to support her claim of retaliation, he also told her that this comment by Socia somehow constituted retaliation. (Id. at 657-60).

worked in the Bronx facility; one encouraged her to date his friend (not employed by the Post); and once she was told she was working like a slave. (Sp. Dep. 143-54; 185-207; 1020-21).

The record is beyond dispute, based on evidence including Sparrock's own repeated admissions, that she never reported any of these allegations of sexual or racial harassment to Lippner, Human Resources or Post management. (Id. at 152-54, 185, 188, 195-96, 198-99, 204-08, 314-17; Lippner Decl. ¶¶18-19, 54, 56; Exs. 10, 12, 13; Lippner Decl. Ex. 2, 7). Her stated reason for not reporting such incidents was that they were personal and embarrassing, (Sp. Dep. 152-54; 314-15), or, in the case of the alleged racially-based comment (an alleged observation that she was "working like a slave"), because she may not have recalled the incident when she met with Lippner. (Id. at 316).

She testified that the only person she told of these alleged incidents was Dean Marson, an ex-boyfriend who lived and worked in Australia. (Id. at 152-54, 314-17)[5] Marson was never, at any time, an employee of the Post, nor did he ever have any authority to hire, fire, promote, transfer, suspend, discipline, affect the compensation of Sparrock, or otherwise affect the terms and conditions of Sparrock's employment, or to effectively recommend any such decisions. (Marson Decl. ¶¶3-5). Marson never told or suggested to Sparrock that he had any such authority and, in fact, explicitly told Sparrock that he had no authority whatsoever with respect to her or any other Post employees. (Marson Decl. ¶6). Indeed, at her deposition, Sparrock reluctantly admitted, after listening to a portion of a conversation with Marson that she secretly recorded, that Marson told her that he had no authority whatsoever at the Post. (Sp. Dep. 733).[6]

---

[5] Marson, an Australian employed at the Herald and Weekly Times in Melbourne, Australia from August 1995 to July 2003 (and at the Cairns Post from July 2003 to the present), worked as an independent contractor at the Post for three months during 2002, which is when he met Sparrock. (Declaration of Dean Marson dated January 23, 2007, at ¶¶1-2). They began a romantic relationship in April 2003, after Marson returned to Australia. (Sp. Dep. 77-78; Marson Decl. ¶1). The relationship lasted until late 2004 or early 2005. (Sp. Dep. 81).

[6] Sparrock also admitted that Marson was not an employee of the Post, and that no one in the Post's management told her that Marson had the authority to effectively recommend anything relating to the terms and conditions of her

**F.    Sparrock's Medical Leaves, SOX Assignment and Resignation**

On August 12, 2004, Sparrock began a medical leave of absence and returned without notice on October 20, 2004. (Sp. Dep. 262-63, 828-29). Prior to her leave, Sparrock had expressed a desire for a new supervisor and a full-time position in Manhattan. (Sp. Dep. 257; Ex. 11). Upon her return, the Post granted her request as Racano assigned her to report to the new Controller, Michael Phelan, on a Manhattan-based Sarbanes-Oxley ("SOX") initiative focusing on the company's internal controls. She never reported to DelGaiso again. (Id. at 256-57, 265-66, 692). The position required no travel to the Bronx (Id. at 255) and she testified she was "very excited about the [new] opportunity," (Id. at 266, 273) which, as Racano told her, "was an important position at the Post." (Id. at 816, 836-37).

At his deposition, Racano explained that he assigned Sparrock to the SOX job because she "had the skills that were required in order to be successful in the [SOX] initiative, and that she was very enthusiastically approaching it as a way to expand her knowledge at the . . . Post and to demonstrate her skills and abilities . . . . And based on my understanding of Christina's background, experience and skills, I reached a conclusion that she was an appropriate candidate." (Racano Dep. 160-61) (emphasis added).[7] After being back at work only one day, on October 21, 2004, Sparrock by her own description "flipped out," "started crying," and "had a panic attack," resulting in another leave of absence, all on account of a "spam" e-mail she received

employment. (Sp. Dep. 154, 169-70). Until contacted by Defendant's counsel in January 2007, Marson never informed anyone affiliated with the Post that Sparrock believed she had been the subject of sexual harassment or racial discrimination at the Bronx facility. (Second Declaration of Dean Marson dated April 19, 2007, at ¶2).

[7] Sparrock's testimony is not to the contrary. She testified that "[c]ontrols is something that is set in place to prevent and detect any material misstatements in a financial – financial reporting. That's what Sarbanes-Oxley is." (Sp. Dep. 411-12). In order to identify risks to internal controls, one must collect various categories of information and analyze data. (Id. at 828). Prior to joining the Post, Sparrock had worked as an auditor at Deans Archer & Co. (Id. at 214-15). Her responsibilities there included acting "as a consultant to establish controls, policies and procedures" for clients. (Id. at 218-20; Ex. 32). She also passed the CPA exam before joining the Post and conceded that by studying for and passing that exam, she became familiar with internal controls. (Id. at 220; 253-54). In addition, as a Senior Financial Analyst, her job entailed collecting information and analyzing data. (Id. at 742).

advertising various drugs, including Valium, Vicodin, Darvon, Viagra, Ambien, Cialis, Buspar and Xanax. (Sp. Dep. 263, 267-69, 1081; Exs. 14, 15). Sparrock explained that the e-mail, which came from an unknown external sender ("Maritza Segura [smllyurpicy@yahoo.com]") caused her distress because she claimed it was "specific to my medical condition" in that she believed the drugs listed related to mental illness; she had no information – none – that anyone at the Post sent this "spam" email to her. (Id. at 1079, 1153).

When she returned to work in early November 2004, she started on the SOX initiative, drafting questionnaires, interviewing various department heads and documenting her findings. (Id. at 820-31; Exs. 16, 17, 18). On November 15th, Sparrock sent an e-mail to Booth, signed, "Stupid, Christina," in which she wrote, among other things, "Yet another puzzle. . . . yet another mastermind game. If I am that incompetent in doing my job, find me another position . . . that would accommodate such an incompetent person. . . . I want a written job description and I would like you, not Mike R[acano], Mike P[helan] or 'The Mr. Jordan Lippner' to discuss this with me." (Ex. 19; Sp. Dep. 774). A few minutes later, Sparrock emailed Booth again, stating, "[h]ere is the flow chart Geoff. . . .I am too stupid to finish this." (Ex. 20; Sp. Dep. 786-87). These inappropriate e-mails led to a November 17, 2004 written performance warning from Phelan, a November 18th rebuttal by Sparrock and a follow-up to the written warning on November 23rd. (Ex. 21, 22, 23). Sparrock testified that as of November 18, 2004, she did not believe that the Post was discriminating against her. (Sp. Dep. 812-13).

Although Sparrock now claims that the Post retaliated against her by assigning her to the SOX position for which she *now* claims she was not qualified, at the time of the assignment she claimed otherwise in an e-mail to Racano dated November 23, 2004:

> In my opinion, I think my approach to this [SOX] project is appropriate. Since I started this project, I have consulted Corporate Audit for direction on several occasions, referred to my Internal Controls workbook that I had when I worked as an

> Auditor, and recently subscribe[d] to a trial edition of Compliance
> Week, which is quite informative on the requirements of the SOX
> 404.  <u>So honestly I believe that I have enough tools to move
> forward on this project.</u>

(Ex. 24) (emphasis added); Sp. Dep. 276).

Seven business days later, on December 6, 2004, Sparrock went out on her final leave of absence from the Post, never to return.  (Sp. Dep. 277-78).  Between November 23, 2004 and December 6, 2004, Sparrock's responsibilities on the SOX assignment had remained the same. (<u>Id.</u> at 281-82).  Sparrock resigned from the Post by voicemail message for Babajko on February 18, 2005. (<u>Id.</u> at 285, 379-80).  Her final salary was $77,250 per year.  (<u>Id.</u> at 252).

## G.    <u>Sparrock's Next Employment as a SOX Auditor</u>

Two days *before* her resignation, on February 16, 2005, Sparrock received a job offer from Geller & Company ("Geller"), a financial outsourcing firm, *as a Sarbanes-Oxley Auditor* at a salary of $88,000 per year and a $7,000 bonus.  (<u>Id.</u> at 13-16, 25-26, 393-94, 400-01; Ex. 25).[8] Sparrock accepted the offer and began working at Geller on March 14, 2005; her job was "to go to firms and to be able to assess if they had adequate internal controls to detect and prevent errors and omissions in their financial reporting."  (<u>Id.</u> at 13, 16).  She believed that she was qualified for the position <u>at the time of her hire,</u> and felt comfortable immediately interacting with clients and performing Sarbanes-Oxley related tasks on her first assignment, even though she only received "on site training."  (<u>Id.</u> at 16-17, 34, 36).

## H.    <u>Sparrock's EEOC Charge and Federal Complaint Filed 113 Days Later</u>

Sparrock filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") on January 10, 2005.  (<u>Id.</u> at 842; Ex. 27).  She never, however, told the EEOC that she had been sexually harassed and never told them anything about alleged

---

[8] Sparrock lied on her Geller employment application, stating that she left the Post because of a restructuring and that her supervisor was Sandra Brudent,  a former benefits manager.  (Ex. 26; Sp. Dep. 385-86).

mistreatment at the Bronx facility. (Id. at 653-54). On November 14, 2005, the EEOC mailed

Sparrock a "Dismissal and Notice of Rights" letter to the P.O. box she identified as her address

on the Charge of Discrimination (Ex. 28; Id. at 843-44). Sparrock instituted the present action

113 days later, on March 7, 2006. (Sp. Dep. 847-48; Ex. 29).[9]

## ARGUMENT

## I.    THE SUMMARY JUDGMENT STANDARD

Fed. R. Civ. P. 56(c) provides for summary judgment when the moving party demon-

strates that there is no genuine issue of material fact and the evidence establishes the moving

party's entitlement to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986); Pepsico, Inc. v. The Coca-Cola Co., 315 F.3d 101, 104 (2d Cir. 2002); Tischman v.

ITT/Sheraton Corp., 882 F. Supp. 1358, 1364-65 (S.D.N.Y. 1995). A party opposing summary

judgment cannot rest on mere allegations and must instead present actual evidence that creates a

genuine issue as to a material fact for trial. Fed. R. Civ. P. 56(e); Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 243 (1986); see also Tischman, 882 F. Supp. at 1365 ("[T]he court must

inquire whether there is sufficient evidence favoring the nonmoving party for a jury to return a

verdict for that party…and grant summary judgment where the nonmovant's evidence is merely

colorable, conclusory, speculative or not significantly probative. The nonmovant must do more

than simply show that there is some metaphysical doubt as to the material facts.") (Internal

citations and quotations omitted). Based on this standard, Sparrock's claims should be dismissed.

## II.    THE POST CANNOT BE LIABLE FOR THE ALLEGED SEXUAL HARASSMENT OF PLAINTIFF

Sparrock asserts that the Post should be liable for alleged sexual harassment committed

by certain managers in the Bronx printing facility between July 2003 and March 2004. As a

---

[9] Certain additional facts relating to Sparrock's Equal Pay Act claim, her disparate treatment claim and in support of Defendant's spoliation of evidence motion are set forth in the corresponding sections, Points IV, VI and VII, below.

matter of law, the Post cannot be liable for this alleged conduct because even if the allegations established a hostile environment claim, the undisputed facts are that she never complained to the Post about these allegations, she has no legally cognizable explanation for such failure, and she was aware that the Post had a complaint mechanism that she could have used.

In Faragher v. City of Boca Raton, 524 U.S. 775 (1998) and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), the Supreme Court held that where no tangible employment action is taken, an employer may not be liable for a sexual harassment claim under Title VII if (1) the employer exercised reasonable care to prevent and promptly correct any sexual harassing behavior; and (2) the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities or to otherwise avoid harm.[10]  Since Faragher and Ellerth, the Second Circuit and numerous federal district courts hearing hostile work environment harassment claims have granted summary judgment in favor of employers on facts similar to those present here.

In Leopold v. Baccarat, Inc., 239 F.3d 243, 245-246 (2d Cir. 2001), for example, the Second Circuit held that the employer established an affirmative defense to liability for sexual harassment where it promulgated an anti-harassment policy with complaint procedures and the employee unreasonably failed to make use of the company's policy.  In words directly applicable here, the court explained that the plaintiff's conclusory assertions of apprehension about being fired for speaking up and her belief that a co-worker's vague and ambiguous complaint was not taken seriously did not constitute a credible fear sufficient to justify her failure to complain.  Id.[11]

---

[10] Even assuming Sparrock's transfer to the SOX position constitutes a tangible employment action (and it does not), it cannot preclude the Post from raising the *Faragher/Ellerth* affirmative defense because the assignment was independent from any discriminatory harassment purportedly committed by managers in the Bronx facility.  See Ferraro v. Kellwood Co., 440 F.3d 96, 100-103 (2d Cir. 2006) (holding that "a supervisor's tangible employment action must be related to the alleged discriminatory harassment to preclude recourse to the *Faragher/Ellerth* affirmative defense," so that even though a demotion and salary reduction were tangible employment actions, the employer could still utilize the affirmative defense because those actions were independent of the harassment).

[11] See also Ferraro, 440 F.3d at 100-103 (applying *Faragher/Ellerth* affirmative defense in affirming summary judgment, holding the plaintiff's assertion that the company ignored or resisted a similar complaint did not justify her failure to report the alleged harassment because the complaint only established that the plaintiff's supervisor was

**A.    The Post Had In Place An Effective Policy To Prevent And Remedy Unlawful Harassment**

In this case, the Post satisfied the first prong of the affirmative defense by having in place throughout Sparrock's employment a sensible policy against unlawful harassment in the Handbook which it distributed to its employees. It is undisputed that Sparrock received and read the Policy, which prohibits unlawful harassment and contains a complaint procedure that provides for a confidential investigation and prohibits retaliation against a complaining employee. Because no evidence exists that the policy was not followed by the Post upon receipt of a complaint, or that the policy was ineffective, the first element of the Post's affirmative defense has been established.[12]

**B.    Sparrock Unreasonably Failed To Notify the Post About Her Allegations Of Harassment**

As for the second prong of the affirmative defense, the "employer has the initial burden of demonstrating that an employee has failed to avail herself of the complaint procedures." O'Dell v. Trans World Entm't Corp., 153 F. Supp. 2d 378, 390 (S.D.N.Y. 2001). "Evidence of '*any* unreasonable failure . . . to use *any* complaint procedure provided by the employer ... will normally suffice to satisfy the employer's burden under the second element of the defense.'" Id. at 390 (quoting Ellerth, 524 U.S. at 765) (emphasis in original). Once the employer establishes

---

"short-tempered and foul mouthed"); Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 290, 293-296 (2d Cir. 1999), cert. denied, 529 U.S. 1107 (2000) (affirming summary judgment because the reluctance of the plaintiff to complain about alleged sexual harassment due to her distrust for the defendant was "not based on a credible fear that her complaint would not be taken seriously or that she would suffer some adverse employment action as a result of filing a complaint"); Eichler v. Am. Int'l Group, Inc., 2007 WL 963279 (S.D.N.Y. March 30, 2007) (granting summary judgment dismissing sexual harassment claims because the plaintiff failed to utilize the procedures set forth in the company's handbook for reporting harassment complaints, in that her written complaints regarding her supervisor made no mention of sexual harassment and her rationale for not reporting the harassment was unreasonable because an "unwillingness to be tagged as a complainer is not an adequate justification for [the plaintiff's] delayed reporting to Human Resources"); Breeding v. Cendant Corp., 2003 WL 1907971 (S.D.N.Y. April 17, 2003) (dismissing plaintiff's sexual harassment claim because the plaintiff's unsupported fear of retaliation if she reported the alleged harassment was not credible).

[12] Sparrock cannot establish that the Post's policy was not followed simply because Lippner did not blindly accept her uncorroborated assertions. See, e.g., Baldwin v. Blue Cross/Blue Shield of Alabama, 480 F.3d 1287, 1303 (11th Cir. 2007) ("The requirement of a reasonable investigation does not include a requirement that the employer credit uncorroborated statements the complainant makes if they are disputed by the alleged harasser").

that the plaintiff failed to notify it of the alleged harassment, "the burden of production shifts to the employee to come forward with one or more reasons why the employee did not make use of the procedures." Leopold, 239 F.3d at 245. "An employee's 'credible fear that her complaint would not be taken seriously or that she would suffer some adverse employment action as a result of filing a complaint' satisfies the employee's burden of production." O'Dell, 153 F. Supp. 2d at 390 (citations omitted). However, "'[a] credible fear must be based on more than the employee's subjective belief. Evidence must be produced to the effect that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints.'" Id. (citations omitted). "The employer . . . may rely upon the absence or inadequacy of such a justification in carrying its ultimate burden of persuasion. Id. at 390-391 (holding that the plaintiff's asserted justification for not complaining of harassment – that she believed that a complaint would not be taken seriously because she heard the company's CEO curse while in her store – did not excuse her delay in reporting).

In this case, the Post has satisfied its burden under the second prong of the affirmative defense where Sparrock admittedly *never* complained about the alleged sexual or racial harassment by the managers in the Bronx facility to anyone in management or human resources, including Lippner. The only person she told was a boyfriend living and working in Australia who in turn told no one – plainly, she unreasonably failed to invoke the Post's complaint procedure.

Moreover, her explanation for the failure was not a credible fear that her complaint would be ignored or worse, that she would be penalized. Rather, she claimed she didn't complain because she found the allegations personal and embarrassing (Sp. Dep. 152-54, 314-15). And, she admitted she had no objective evidence the Post had ever ignored or failed to investigate a

complaint of discrimination or harassment. (Sp. Dep. 525-31). In light of these admissions, the

Post has established its affirmative defense and summary judgment should thus be granted.[13]

## III.    THE POST IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM OF RETALIATION

To establish a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged

in protected activity known to her employer; (2) the employer took a material adverse action

against her; and (3) a causal connection exists between the protected activity and the adverse

action. Woods v. Enlarged City School Dist. of Newburgh, 473 F. Supp.2d 498, 527 (S.D.N.Y.

2007).[14] If the plaintiff establishes a *prima facie* case, the employer must proffer a legitimate,

non-retaliatory reason for its decision, whereupon the plaintiff bears the burden of showing that

the reason given was a pretext for unlawful retaliation. Eichler, 2007 WL 963279 at *17.

Sparrock cannot establish a *prima facie* case of retaliation for two reasons: no material

adverse action was taken against her and no causal nexus exists between her complaints and her

alleged adverse actions. Even if she could establish a *prima facie* case, the Post had legitimate,

non-retaliatory reasons for its employment decisions, which Sparrock cannot disprove.

### A.    Plaintiff Cannot Establish A *Prima Facie* Case Of Retaliation Because No Adverse Action Was Taken Against Her

In the First Amended Complaint, Sparrock asserts she suffered two adverse retaliatory

---

[13] To the extent her claims are asserted under Title VII, they should also be dismissed based on her failure to file within ninety days after receipt of a "Dismissal and Notice of Rights" letter. 42 U.S.C. § 2000e-5(f)(1). Where as here, the date of receipt is in dispute, it is presumed that the right-to-sue letter was received three days after its mailing. Sherlock v. Montefiore Medical Center, 84 F.2d 522, 525 (2d Cir. 1996). The failure to conform to the ninety day filing requirement precludes a plaintiff from initiating a lawsuit based on the same facts as those alleged in the EEOC Charge. See Felton v. New York Post, 1990 WL 113176, *2 (S.D.N.Y. Aug. 2, 1990), aff'd, 930 F.2d 908 (2d Cir. 1991). In this action, because the EEOC mailed Plaintiff a right-to-sue letter to the correct address on November 14, 2005, and Plaintiff did not file her Complaint until March 7, 2006, 19 days after the filing deadline had passed (assuming three days for mailing), her claims under Title VII were untimely, requiring dismissal.

[14] Claims of retaliation and constructive discharge under the NYSHRL, NYCHRL and Section 1981 are analyzed in the same manner as claims under Title VII. See Eichler v. Am. Int'l Group, Inc., 2007 WL 963279 at *7 (S.D.N.Y. March 30, 2007); Penney v. AIG Domestic Claims, Inc., 2007 WL 541711 at *5 (S.D.N.Y. Feb. 20, 2007).

actions: first, what she regarded as an abrupt end to a meeting on April 20, 2004, and second, her assignment to the SOX position in October 2004.  These are not retaliatory or "adverse actions."

In Burlington Northern & Santa Fe Ry. Co. v. White, 126 S.Ct. 2405, 2414-2415 (2006), the Supreme Court explained that "[t]he anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  Thus, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Id. at 2415 (citations omitted).  The "standard for judging harm must be objective," as an objective standard "avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings."  Id.

In this regard, "Title VII . . . does not set forth a general civility code for the American workplace."  White, 126 S.Ct. at 2415 (citations omitted).  "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work . . . [such as] personality conflicts that generate antipathy and snubbing by supervisors and co-workers."  Id. (citations omitted).[15]

Here, Sparrock contends that after meeting with certain managers in the Bronx facility for several hours on April 20, 2004 in the midst of a multi-day budget process, the managers walked out of the meeting.  She does not provide any other information to connect the alleged walk-out to her internal complaint.  She does not even claim any disparaging comments were made.  This is precisely the type of non-actionable "petty slight" referred to by the Supreme Court in White.

As for the SOX assignment, "reassignment of job duties is not automatically actionable.  Whether a particular reassignment is materially adverse depends upon the circumstances of the

---

[15] See, e.g., Nieves v. Angelo, Gordon & Co., 2007 WL 1098710 at *7 (S.D.N.Y. April 10, 2007) (holding that a supervisor's "increasing abrupt and hostile demeanor towards the plaintiff after her complaint" did not constitute an adverse action); O'Dell, 153 F. Supp.2d at 396 (employer's failure to inform plaintiff that she was welcome to return to work was not an adverse action as "Title VII ... is not a shield against harsh treatment at the workplace").

particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." White, 126 S. Ct. at 2417 (citations omitted).[16]  Here, "all of the circumstances" – and these are undisputed – are that Sparrock requested a transfer to a full-time position in Manhattan and wished to report to a new supervisor, and the Post granted her request by reassigning her to an important position reporting to Phelan.  Sparrock was unquestionably qualified for the position based on her prior work experience as an auditor, years of experience as a Senior Financial Analyst and her successful passage of the CPA exam, which required extensive knowledge of internal controls.  She enthusiastically accepted the assignment and admitted in an e-mail that she had been provided with all of the tools necessary to perform the job.  And, before resigning from the Post she applied for and accepted a position *as a Sarbanes-Oxley Auditor* at another employer.  She said she felt comfortable in the position immediately.  Under the "objective standard" set forth in White, this assignment, which was made in response to Plaintiff's request, cannot be unlawful.

Moreover, where, as here, a "plaintiff provides no direct evidence of a retaliatory motive for [an adverse action] aside from her own conclusory allegations, which are plainly insufficient to defeat defendants' motion for summary judgment, . . . plaintiff must rely on the temporal proximity of the protected action and the adverse employment action." Woods, 473 F. Supp.2d at 528.  Temporal proximity must be 'very close.'" Clark County School District v. Breeden, 532 U.S. 268, 273-274 (2001) (citing with approval cases dismissing retaliation claims where there had been three and four month periods between the protected activity and adverse action).  In this district, a lapse of more than three months between the protected activity and the adverse

---

[16]  See, e.g., Grennan v. Nassau County, 2007 WL 952067 at *10 (E.D.N.Y. March 29, 2007) (holding that a "transfer from one undesirable location to another one cannot be deemed adverse," particularly where the transfer did not entail a substantive change in the nature of the plaintiff's work).

action precludes a finding of causal connection based on temporal proximity.[17]  But even a close

relationship in time between the complaint and adverse action is not necessarily dispositive of

motive.  Padob v. Entex Info. Serv., 960 F. Supp. 806, 814 (S.D.N.Y. 1997) (citations omitted).

Here, however, Sparrock's assignment to the SOX position occurred seven months after

her March 30, 2004 complaint and five months after her May 2004 complaint – time periods

which are both lengthy *and* broken up by her April 29, 2004 request for a transfer to Manhattan.

### B.    The Post Had Legitimate, Non-retaliatory Reasons For Assigning Plaintiff To The SOX Position, Which She Cannot Disprove

Even assuming that Sparrock could establish a *prima facie* case, she has no evidentiary

basis to show that any of the Post's legitimate employment decisions were pretextual.  To the

contrary, Sparrock does not deny that: (1) she requested a transfer to Manhattan on a full-time

basis and that the SOX position only required her to work in Manhattan; (2) she wished to report

to a different supervisor; (3) she expressed enthusiasm about working on the SOX project; (4)

the SOX project was important and needed to be completed; (5) she worked as an Auditor before

joining the Post and passed the CPA exam, which required extensive knowledge of internal

controls; (6) the SOX position and her position as a Senior Financial Analyst both required her to

collect information and analyze data; (7) she admitted in an e-mail to Racano that she had

"enough tools to move forward on this project;" and (8) she commenced employment as a SOX

Auditor almost immediately after resigning from the Post.  All of this conclusively establishes

that the Post is entitled to summary judgment.

---

[17] See, Butts v. NYC Dep't of Hous. Pres. & Dev., 2007 WL 259937 at *18 (S.D.N.Y. Jan. 29, 2007) (holding a time differential of more than three months between protected activity and adverse action is insufficient to survive summary judgment"); Woods, 473 F. Supp.2d at 529 (granting summary judgment; holding five-month interval between complaint and termination too long to establish causal connection); Gilford v. City of New York, 2004 WL 1574695 at *7 (S.D.N.Y. July 14, 2004) ("Claims of retaliation are routinely dismissed when as few as three months elapse between the protected activity and the alleged act of retaliation").

## IV.    PLAINTIFF'S EQUAL PAY ACT CLAIM SHOULD BE DISMISSED

Sparrock alleges that the Post violated the Equal Pay Act ("EPA") by paying her less than it paid employee Frank Cusimano for performing comparable work. Cusimano was hired in July 2004 as a Senior Financial Analyst at a salary of $80,000 per year. (Cusimano Dep. 6-7, 38-39). Cusimano's prior position was Manager of Finance for the Risk Management Department at Foot Locker at an annual salary of $80,000. (Cusimano Dep. 7, 9). Plaintiff's claim must fail because it is an undisputed fact that in order to secure Cusimano's services, the Post believed it necessary to match his then salary. (Affidavit of Michael Racano sworn to on May 11, 2007, ¶4).

To state a claim under the EPA, a plaintiff must show that (1) the employer pays higher wages to employees of the opposite sex; (2) the employees perform equal work in jobs requiring equal skill, effort and responsibility; and (3) the jobs are performed under similar working conditions. 29 U.S.C. § 206; see also Pollis v. New School for Social Research, 132 F.3d 115, 118 (2d Cir. 1997). Even if a Plaintiff establishes all three criteria, the EPA is not violated where the challenged "[pay] differential [is] based on any other factor other than sex." Id.

It is well settled that "[s]alary matching – payment of a higher salary to match an incoming employee's previous earnings – . . . is a valid reason for wage differences, and one that falls into the catch-all factor-other-than-sex." Engelman v. Nat'l Broad. Co., Inc., 1996 WL 76107 at *10 (S.D.N.Y. Feb. 22, 1996). Thus, "[t]o attract qualified people, an employer may offer those people their reservation price or opportunity cost -- i.e., the salary they would command in another job," as such "policies reward prior experience and allow an employer to lure talented people from other settings, serving bona fide business goals without discriminating unlawfully." Engelman, 1996 WL 76107 at *10 (dismissing EPA claim; employer relied in part on prior salary history in setting wages); Gross v. Nat'l Broad. Co., Inc., 232 F.Supp.2d 58, 71 (S.D.N.Y. 2002) (matching employee's salary to that of a prior job justifies a wage differential).

In this case, it is undisputed that Cusimano's salary was set by the Post to match his prior salary at Foot Locker of $80,000 per year. This constitutes a legitimate justification for the *de minimis* pay differential between Cusimano and Sparrock, and Sparrock cannot demonstrate that this explanation was pretextual.[18]  Accordingly, this claim should be dismissed.

## V.    AS A MATTER OF LAW, PLAINTIFF CANNOT ESTABLISH A CONSTRUCTIVE DISCHARGE CLAIM

A "claim for constructive discharge requires the plaintiff to prove that her employer deliberately and discriminatorily created work conditions 'so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" Ferraro v. Kellwood Co., 440 F.3d 96, 101 (2d Cir. 2006) (citations omitted). A "constructive discharge cannot be proven merely by evidence that an employee disagreed with the employer's criticisms of the quality of his work, or did not receive a raise, or preferred not to continue working for that employer. Nor is the test merely whether the employee's working conditions were difficult or unpleasant." Spence v. Maryland Cas. Co., 995 F.2d 1147, 1156 (2d Cir. 1993).[19]

Moreover, "[t]he fact that a plaintiff had been out on leave for a time prior to her resignation makes it less likely that the resignation was prompted by an atmosphere so intolerable that a reasonable person would have felt compelled to resign." Katz v. Beth Israel Medical Center, 2001 WL 11064 at *12 (S.D.N.Y. Jan. 4, 2001) (dismissing constructive discharge claim where the plaintiff had been out on leave for approximately five months before her resignation). Similarly, an "employee who remains on the job while looking for alternative employment is hard-pressed to establish that her working conditions were intolerable." Baptiste

---

[18]  Sparrock's total compensation was $80,000 (75,000 plus a one-time $5000 bonus) in 2003. In 2004, the Post paid her a salary of $77,250, but no bonus.

[19]  See also Petrosini v. Bell Atlantic, 385 F.2d 210, 230-231 (2d Cir. 2004) (affirming dismissal of constructive discharge claim pursuant to motion for summary judgment where the plaintiff endured eight years of gender-based harassment but failed to show that the employer's actions immediately prior to her resignation "'ratcheted' the harassment up to 'the breaking point' for a reasonable person in [her] situation") (citations omitted).

v. Cushman & Wakefield, 2007 WL 747796 at *12 (S.D.N.Y. March 7, 2007) (citations omitted) (granting summary judgment where the plaintiff sought new work before resigning and did not tender her resignation until after she accepted new employment).

In this case, as in Katz, Sparrock was out on leave for several months prior to her resignation. Therefore, the conditions of employment at the time of her resignation in February 2005 could not possibly have been so intolerable that a reasonable person in her shoes would have had no choice but to resign. Moreover, Sparrock only tendered her resignation *after* receiving an offer from Geller at a much higher rate of pay than what she was earning at the Post. Thus, "[i]t cannot be said that Plaintiff was forced involuntarily to resign when the undisputed facts demonstrate she chose the date and time to do so." Baptiste, 2007 WL 747796 at *12.

Lastly, Sparrock's constructive discharge claim also fails because she never utilized the Post's policy to report the alleged conduct that purportedly played a role in her resignation, thereby depriving the Post of an opportunity to respond to her grievances. See Breeding, 2003 WL 1907971 at *9 ("Where an employer provides an opportunity for an employee to air her grievances, she must give the employer the chance to respond to them before she resigns").

## VI.    PLAINTIFF CANNOT ESTABLISH A DISPARATE TREATMENT CLAIM

Sparrock contends that she was subjected to disparate treatment on the basis of her race and gender based on her *belief* that Holzmann and Cusimano were treated more favorably than she was with respect to training, work assignments and compensation. As a matter of law, this claim should fail because Sparrock cannot establish a *prima facie* case of discrimination.

To establish a *prima facie* case of discrimination, Sparrock must show that "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination."

Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000); Nugent v. St. Luke's/Roosevelt Center, 2007 WL 1149979 at *15 (S.D.N.Y. April 18, 2007).[20]

In this case, it is undisputed that: (1) Holzmann had a different job title than Sparrock (Senior Accountant) with different job responsibilities (Sp. Dep. 238-40; 504-05); (2) Holzmann never received higher compensation than Sparrock (Id. at 1149-50); (3) from July 2003 through August 2004, Sparrock worked three to four days a week in the Bronx facility, whereas Holzmann (and later Cusimano, as of his hire in July 2004) worked full-time in Manhattan (Id. at 479-80, 509-11; Cusimano Dep. 25-26); (4) Sparrock was assigned a private office in the Bronx facility, whereas Holzmann and Cusimano were never assigned private offices at their work locations (Sp. Dep. at 461); (5) as of October 2004, when Sparrock commenced work on the SOX assignment, she and Cusimano worked in different departments (Id. at 692); (6) DelGaiso was a "loud talker" with everyone, including Holzmann (Id. at 488); (7) Sparrock asked for help in performing her job functions because she believed she was overloaded with work and the Post accommodated her request by assigning Holzmann to assist her with certain aspects of her job (Id. at 470-79); (8) DelGaiso provided training to Sparrock (Id. at 488); and (9) Sparrock was invited to attend the only formal training session she claims to have been excluded from, and that she did not attend the training because it was cancelled (Ex. 31; Id. at 660-84).

Based on the foregoing, it is clear that Sparrock cannot establish a *prima facie* case of discrimination because she was not subjected to any adverse employment action and she has no factual support for her conclusory assertions of differential treatment *based on* gender or race.[21]

---

[20] "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. . . . To be 'materially adverse,' a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Gamble v. Chertoff, 2006 WL 3794290 at *5 (S.D.N.Y. Dec. 27, 2006). Moreover, where a plaintiff attempts to raise an inference of discrimination by showing that a similarly situated employee was treated differently, "the individuals with whom [she] attempts to compare herself must be similarly situated in all material respects." Shumway v. United Parcel Service, 118 F.3d 60, 63 (2d Cir. 1997).

## VII.    PLAINTIFF SHOULD BE SANCTIONED FOR SPOLIATION OF EVIDENCE

Sparrock testified that, because she anticipated litigation, she secretly tape recorded at least one of her first two meetings with Lippner (among other conversations) by hiding a tape recorder in her pocket. (Sp. Dep. 578, 916). Notably, although she recorded other conversations in this manner and produced those tapes upon demand by the Post, she has not produced the Lippner tape. (Sp. Dep. 578, 594-97). In addition, Sparrock has also destroyed and/or failed to produce the notes she took during her meeting with Lippner in which he advised her of the results of his investigation. (Id. at 914-15). Sanctions are appropriate based on this spoliation of critical evidence.

Spoliation of evidence is "'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" Byrnie v. Town of Cromwell, 243 F.3d 93, 107 (2d Cir. 2001) (citations omitted). When spoliation has occurred, a wide range of sanctions may be imposed, including dismissal or judgment by default, the preclusion of evidence, the granting of an adverse inference, and the granting of costs and attorneys' fees. See Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 106-107 (2d Cir. 2002); Metro. Opera Ass'n., Inc. v. Local 100, Hotel Employees and Rest. Employees Int'l Union, 212 F.R.D. 178, 219-220 (S.D.N.Y. 2003); Miller v. Time-Warner Communications, Inc., 1999 WL 440781 at *5-*6 (S.D.N.Y. June 29, 1999).

Defendant is aware that, in opposition to its summary judgment motion, Sparrock will attempt to attack the manner in which Lippner conducted the investigation. However, by destroying the recording of the Lippner meeting, and failing to turn over her notes she deprives

---

[21]  See, e.g. Montgomery v. Chertoff, 2007 WL 1233551 at *11-*12 (E.D.N.Y. April 25, 2007) (holding that excessive scrutiny, denial of training which did not result in negative consequences, unfair work assignments, exclusion from staff meeting and inappropriate references to plaintiff's personal life did not constitute materially adverse actions); Stoddard v. Eastman Kodak Co., 2007 WL 952020 at *7-*8 (W.D.N.Y. March 27, 2007) (dismissing disparate treatment claim where plaintiff failed to provide any evidence in support of her conclusory allegations of differential treatment).

24

the Post of evidence that would necessarily rebut any potential claims relating to the investigation and support its position that Lippner's investigation was thorough and appropriate in all respects..  This destruction of a verbatim recording of the most important portion of the Post's response to Sparrock's complaint warrants the granting of summary judgment as to the Post's affirmative defense set forth in Point II above, and thus dismissal of the harassment claims.  At the very least, Plaintiff should, in the alternative, be precluded from arguing that Lippner's investigation was not thorough and appropriate in all respects, or that her complaint was not devoid of any allegation of sexual or racial harassment (with the same result).  The Post reserves the right to comment further with respect to the appropriate remedy after viewing the evidence Sparrock attempts to adduce in opposition to the various motions herein.

## CONCLUSION

For the foregoing reasons, Defendant submits that summary judgment should be entered dismissing the First Amended Complaint in its entirety.

Dated: New York, New York
      May 11, 2007

Respectfully submitted,

By: _____
    Blythe E. Lovinger, Esq.
    Daniel Turinsky, Esq.
    Allison S. Weiss, Esq.
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
(212) 506-1700